**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Enterprises Car Company LLC, et al., | No. CV-21-01681-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Dilsher Ali, et al., | |
| Defendants. | |

Plaintiffs Mark Enterprises Car Company LLC, Mark Enterprises Car Company II LLC, Mark Enterprises Car Company III LLC,[1] Mark Dubowy, Dylan Mougel, and Joshua Spencer (collectively, "Plaintiffs") filed a 42 U.S.C. § 1983 action against Defendants Special Investigator Dilsher Ali, Chief Special Agent Reginald Grigsby, Supervisor James Cope, (collectively, "Defendants") and three of their unnamed supervisors ("John Does 1–3").[2] In their Second Amended Complaint ("SAC"), Plaintiffs allege several violations of their Fourth Amendment rights. (Doc. 45.) Before the Court is Defendants' motion for summary judgment (Doc. 101). The motion is fully briefed. (Docs. 111, 116.) The Court heard oral argument on March 28, 2025. For the following reasons, the Court grants the motion.

---

[1] The Court will hereinafter refer to the three Mark Enterprises entities collectively as "Mark Enterprises."

[2] The Court will hereinafter refer to Cope, Grigsby, and John Does 1–3 collectively as the "Supervisory Defendants."

1    **I.    Background**

2         **a. Facts**

3         Dubowy, Spencer, and Mougel own and operate three car dealerships ("Mark

4    dealerships") in the state of Arizona, which buy and sell imported vehicles as part of their

5    inventory. (Doc. 111 at 2.) Around 2018, Plaintiffs began selling imported Ford trucks

6    bought at auction from TCB Importing ("TCB") and Johnny Cooper. (*Id.* at 3.) Ford makes

7    two types of similar trucks: the "F-150" and the "Lobo." (Doc. 111-1 at 4.) Ford

8    manufactures both trucks in Dearborn, Michigan but markets and sells the F-150 truck in

9    the United States, and markets and sells the Lobo to Mexican markets. (*Id.*)

10         Prior to the suit, Plaintiffs received complaints from customers, alleging various

11    problems with the vehicles after purchase. Specifically, Richard and Laurel Dunn

12    (collectively, the "Dunns") wrote a letter to Mark Enterprises accusing the business of

13    fraud in January 2019. (Doc. 106-2 at 25–29.) In their letter, the Dunns state that Ford

14    would not honor their warranty because the vehicle came from Mexico—a fact

15    unbeknownst to the Dunns at the time of purchase. (*Id.* at 26.) In August 2019, Michael

16    Wilson also complained to Mark Enterprises because the "Ford F-150 Platinum 4x4" he

17    purchased was missing key features such as a "lane keep option," "parallel park assist,"

18    and "Sirius Radio." (*Id.* at 2–3.) Wilson believed these features should have been present

19    in the model he purchased and that Mark Enterprises sold him a different model that Ford

20    designated for the Mexican market. (*Id.*) Plaintiffs admit that their dealerships purchased

21    imported vehicles through auction with Vehicle Identification Numbers ("VIN")

22    associated with the Mexican market. (Doc. 45 ¶ 19.)

23         Between 2015 and 2019, multiple federal agencies investigated Cooper and TCB

24    based on evidence of improper importation of vehicles from Mexico into the United States.

25    (Doc. 106-2 at 47–48.) The overlap between the investigation into Cooper and the Mark

26    dealerships started on March 19, 2019, when Detective Lan Le, with the Arizona

27    Department of Public Safety ("DPS"), entered one of the Mark dealerships while

28    investigating a separate matter. (Doc. 106-3 at 9–10.) Mougel himself asked Le to

1    investigate some of the Ford F-150s that Mark Enterprises recently bought at auction. (*Id.*)

2    Mougel voiced concern about the vehicles to Le because the vehicles had low mileage and

3    were purchased at a suspiciously low price. (*Id.*) Le ran the VIN of one of the Ford trucks

4    and found its VIN indicated that it was a Lobo and not an F-150. (*Id.* at 9.) Le later referred

5    the matter over to the Arizona Department of Transportation ("ADOT") and the Arizona

6    Attorney General's Office ("AGO"). (*Id.* at 10.)

7         Further investigation by ADOT confirmed that the vehicle was a Lobo and linked

8    the Lobo's importation to TCB and Cooper. (Doc. 106-1 5–7.) ADOT coordinated with the

9    National Highway Traffic Safety Administration ("NHTSA") to uncover background on

10   TCB's alleged scheme to illegally import Lobos into the U.S. by using fraudulent labels

11   and "a network of dealers" to make vehicles appear compliant with U.S. standards. (*Id.* at

12   6.) In May 2019 and under advisement from the DPS and ADOT, AGO launched an

13   investigation to determine whether any vehicles imported by Cooper and TCB were sold

14   at the Mark dealerships. (Doc. 106-1 at 10.)

15        One month prior, the Department of Homeland Security Investigations ("HSI")

16   opened its own investigation into TCB for its alleged importation scheme. (Doc. 106-2 at

17   40.) Investigators with HSI and AGO worked together as the respective lead federal and

18   state agencies along with assistance from Ford and Fiat Chrysler employees. (Doc. 106-3

19   at 12.) Ford informed AGO that seventeen of the vehicles in the Mark dealerships ("subject

20   vehicles") had VINs associated with the Mexican market, (*id.* at 15), and Fiat Chrysler

21   confirmed that Mark Enterprises did not have the necessary emission certification labels

22   indicating those vehicles were compliant with U.S. emission standards. (*Id.* at 20.)

23        On September 30, 2019 and following these investigations, Ali submitted an

24   affidavit for a search warrant to the Maricopa County Superior Court, where a neutral judge

25   signed it. (Doc. 106-1 at 38, 47.) The affidavit contained information uncovered by the

26   state's investigation, including prior consumer complaints, statements from Ford employee

27   Jason Kosofsky, statements from Fiat Chrysler employee Michael Lewis, and email

28   communications with HSI Investigators. (Doc. 101-2 at 21–28.) The judge found that the

1    affidavit established probable cause to search the dealerships based on the investigation

2    into Cooper, TCB, and associates, for violations of Arizona fraud and conspiracy laws.

3    (Doc. 106-1 at 13.) On October 1, 2019, Defendants executed the warrant on all three Mark

4    dealerships, seized fifteen vehicles and corresponding "deal jackets" associated with

5    vehicle sales, and downloaded data from cell phones and computers related to dealership's

6    business. (Docs. 106-3 at 37; 111-1 at 63–65; 111-2 at 3–5, 110.)

7                    **b.  Procedural Posture**

8          Plaintiffs allege violations of their Fourth Amendment rights. Count I alleges

9    Defendants engaged in judicial deception by presenting a "false or misleading affidavit" to

10   a neutral magistrate to obtain a search warrant. (Doc. 45 at 29–32.) Count II alleges that

11   Cope and Grigsby violated Plaintiffs' Fourth Amendment rights by failing to properly

12   supervise and control their subordinates. (*Id.* at 32–33.) Count III alleges that all

13   Defendants conducted an unreasonable search. (*Id.* at 33–35.) At oral argument, Plaintiffs

14   conceded that the officers acted within the scope of the warrant, but they maintain that the

15   warrant was too broad.

16         Defendants move for summary judgment on the grounds that (1) the affidavit

17   prepared by Ali did not contain any misrepresentations or omissions; (2) Defendants did

18   not act with intentional or reckless disregard for the truth; (3) the officers acted within the

19   scope of a valid search warrant; and (4) Defendants are entitled to qualified immunity.

20   (Doc. 101.)

21   **II.    Legal Standard**

22         Summary judgment is appropriate if, viewing the facts in a light most favorable to

23   the nonmoving party, there is no genuine dispute as to any material fact, and the movant is

24   entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are those facts

25   that would affect the outcome of the case, and a dispute is genuine if a reasonable jury

26   could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty*

27   *Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is also proper "against a party

28   who fails to make a showing sufficient to establish the existence of an element essential to

1    that party's case, and on which that party will bear the burden of proof at trial." *Celotex*

2    *Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

3        The defendant bears the initial burden to show an absence of evidence to support an

4    essential element of the plaintiff's case or an absence of a genuine dispute of material facts.

5    *Id.* at 323. Once the defendant has done so, the burden shifts to the plaintiff, who must "go

6    beyond the pleadings" and use the "kinds of evidentiary materials listed in Rule 56(c)" to

7    "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also*

8    Fed. R. Civ. P. 56. "Where the record taken as a whole could not lead a rational trier of fact

9    to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec.*

10    *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of*

11    *Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

12    **III.    Analysis**

13        Defendants argue that Plaintiffs have no evidence that they made any

14    misrepresentation or omission that could form the basis of a judicial deception claim. (Doc.

15    101 at 10.) Defendants also raise a qualified-immunity defense to Counts II and III. (*Id.* at

16    8–10.)

17                    **a.    Count I—Judicial Deception**

18        The Ninth Circuit recognizes a constitutional right to be free from judicial deception

19    in the issuance of a warrant. *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007). Courts

20    "effectively intertwine the qualified immunity question" with a plaintiff's judicial

21    deception claim. *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002). Therefore, qualified

22    immunity does not serve as an independent bar to a plaintiff's recovery in a judicial

23    deception claim because "no reasonable officer could believe that it is constitutional to act

24    dishonestly or recklessly with regard to the basis for probable cause in seeking a warrant."

25    *Id.*

26        To survive summary judgment on a judicial deception claim, a plaintiff "must (1)

27    establish that the warrant affidavit contained misrepresentations or omissions material to

28    the  finding  of  probable  cause,  and  (2)  make  a  substantial  showing  that  the

- 5 -

misrepresentations or omissions were made intentionally or with reckless disregard for the truth." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011) (quotation marks omitted). "'Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause,' and a claim of judicial deception may not be based on an officer's erroneous assumptions about the evidence he has received." *Daschke v. Hartenstein*, 420 F. Supp. 3d 919, 932 (D. Ariz. 2019) (quoting *United States v. Smith*, 588 F.2d 737, 739–40 (9th Cir. 1978)).

"If a party makes a substantial showing of deception, the court must determine the materiality of the false statements or omissions." *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (citation omitted). An omission or misrepresentation is material where "a court would have declined to issue the [warrant] had the defendant been truthful." *David v. Kaulukukui*, 38 F.4th 792, 801 (9th Cir. 2022) (quotation marks omitted). Because Plaintiffs claim Ali made both misrepresentations *and* omissions in the affidavit, the Court analyzes them each in turn.

### i.  Alleged Misrepresentations in the Affidavit

Plaintiffs identify eight statements from Ali's affidavit that they assert are misrepresentations:[3]

1. The Office of the Arizona Attorney General received numerous consumer complaints against Mark Mitsubishi and Mark Kia "over the past couple of years," including complaints of the unlawful sale of vehicles specifically manufactured for the Mexican market to unwitting customers in the United States under false pretenses.

2. The subject vehicles were manufactured by Ford for the "Mexican market" and were imported illegally.

3. Ford Lobos and Ford F-150s are different vehicles and not visually and functionally identical in every material respect.

4. Ford trucks intended for sale in the Mexican market and subsequently imported to the United States do not meet U.S. safety and emissions standards.

5. Ford Lobos and Ford F-150s are not covered by identical warranties.

---

[3] The Court will refer to each statement in the order listed followed by the number listed. For example, the Court will refer to the first statement about "numerous consumer complaints," as Statement 1.

1
2

6. The manufacturer or certification labels in the subject vehicles' door jams were counterfeit or had been illegally modified or replaced with fictitious English labels.

3
4

7. Ford Lobos sold by Plaintiffs were illegally relabeled and re-badged as Ford F-150 Platinums or King Ranches.

5
6

8. The Dunns' and Wilson's vehicles were not covered by warranties; were equipped differently because they were initially intended for sale in Mexico; and any dispute with the Dunns or with Wilson was not completely resolved to the satisfaction of the customer.

7

(Doc. 45 ¶ 90.)

8
9
10
11
12
13
14
15
16

*Statement 1.* Plaintiffs maintain that Statement 1 constitutes a misrepresentation because Ali "only knew of one complaint regarding an odometer"; Mark Enterprises did not know of Wilson's complaint; and Mark Enterprises had a low complaint-to-sale ratio. (Doc. 111 at 10.) There is no evidence that Statement 1 was a misrepresentation of a material fact. The affidavit references the Dunns' and Wilson's complaints (Doc. 101 at 22–26), and their existence is supported by evidence in the record. (Doc. 101-2 at 5–6, 26–27.) Plaintiffs' argument actually contradicts their claim by conceding Ali knew of *another* complaint in addition to those made by the Dunns and the Wilsons—one relating to an odometer.

17
18
19
20

At oral argument, Plaintiffs argued that the use of the word "numerous" is a misrepresentation since the affidavit refers to two complaints and "numerous" usually refers to more than two. However, Plaintiffs conceded at oral argument that even if this amounted to a misrepresentation, it would not be material to a finding of judicial deception.

21
22
23
24
25
26
27

*Statement 2.* Plaintiffs argue that Statement 2 is a misrepresentation because: "the Fords Cooper sold to Mark Enterprises were imported according to mandated federal procedures"; "Customs and Border Patrol received and approved import documentation"; and Mark Enterprises "reasonably relied" on paperwork submitted by Cooper and "inspected and approved by federal and state agencies." (Doc. 111 at 11.) In a supplemental brief following oral argument, Plaintiffs cited to five exhibits to support its arguments.[4] (Doc. 121.) Plaintiffs point to deposition testimony from Spencer that establishes he met

28

---

[4] At oral argument, the Court asked Plaintiffs to provide citations to the previous argument in the record since none could be found in its original response brief. (Doc. 111.)

1    with Cooper in 2019, and Cooper "showed [him] documents" that Cooper had good

2    standing as an importer. (Doc. 111-1 at 36.)

3         Plaintiffs' proffered evidence is not evidence of a misrepresentation of a material

4    fact. The evidence focuses not on whether Ali lied but on whether Plaintiffs properly relied

5    on Cooper for his importing services. In fact, Spencer noted that Cooper's "packet of

6    documents" only related to Cooper's status as an importer and not the vehicles themselves.

7    (*Id.* at 37.) Plaintiffs also cite to deposition testimony from Mougel stating that Cooper

8    "had a large file of [import] paperwork," but "[he] didn't go through it." (*Id.* at 51.)

9    Plaintiffs evidence might be relevant to dispute potential criminal liability, but it does not

10   show that Ali misrepresented that the vehicles were imported illegally.

11        Moreover, there was a factual basis for Statement 2. During the investigation, Ali

12   interviewed Neil Thurgood, a safety compliance analyst for United States Department of

13   Transportation. (Docs. 101-2 at 19; 106-2 at 31.) When drafting the affidavit, Ali relied on

14   Thurgood to establish that Mark Enterprises did not follow proper procedures for vehicle

15   importation. (Doc. 101-2 at 19.) Ali then included information from the interview in the

16   affidavit, presenting Thurgood's qualifications to the magistrate and making it clear to the

17   magistrate what portions of the affidavit were based on Thurgood's opinion. (*Id.*)

18        Plaintiffs' reliance on Ali's deposition testimony and an expert report from Coleman

19   Sachs similarly does not create a genuine dispute of fact. In Ali's deposition, he testified

20   that he "briefly went through" the build sheets of the subject vehicles, but he did not have

21   expertise in "diagnosing . . . safety differences." (Doc. 111-1 at 129.) This testimony does

22   not support any of Plaintiffs' arguments that Ali misrepresented information in Statement

23   2. Instead, the affidavit clearly states that Ali based Statement 2 on his interview with

24   Thurgood and not his own knowledge or expertise. (Doc. 101-2 at 19.) Sachs's report gives

25   an overview of the VIN system, importation requirements, and his qualifications as an

26   expert. (Doc. 111-2 at 44–45.) Sachs does not opine as to whether the subject vehicles were

27   illegally imported, so his testimony cannot serve to create a genuine dispute about the

28   veracity of Statement 2. Statement 2 was not a misrepresentation.

*Statement 3*. Plaintiffs assert that Ali misrepresented the difference between the Ford F-150 and the Lobo, both visually and functionally, because Ford F-150s and Lobos "are all manufactured identically in Dearborn, Michigan." (Doc. 111 at 11.) There is no statement in the affidavit about the visual similarities of the two trucks (Doc. 101-2 at 13–28), and thus, there cannot be any misrepresentation on that point. The Court addresses alleged misrepresentations about *functional* differences between the vehicles in the Statement 7 section.

*Statement 4*. Plaintiffs assert that Statement 4 is a misrepresentation because in Cope's deposition, he testified that he believed all the subject vehicles would pass Arizona emission standards tests because one of the vehicles tested passed. (Doc. 111-1 at 105–06.) But Cope's deposition only speaks to Arizona's emissions standards, not U.S. standards, which Cope notes in his testimony. (*Id.*) And, even assuming the testimony supports Plaintiffs' point, the inquiry is not whether the subject vehicles could pass emissions tests but whether Ali misrepresented facts in his affidavit.

To support Statement 4, Ali listed his sources and summarized each communication in the affidavit, including: his interview with Thurgood; an email from Kosofsky confirming that Ford sold the subject vehicles to dealers in Mexico; email correspondence from Michael Lewis, Security Operations at Fiat Chrysler Automobiles, confirming the vehicles were intended for the Mexican market based on their VINs; and a report from HSI's investigation confirming that Lobos meet Mexico's emissions and safety standards, which differ from U.S. standards. (Doc. 106-3 at 21; Doc. 106-3 at 12–13, 15–16, 20.) Plaintiffs do not counter with any evidence that the subject vehicles were not intended for the Mexican market or that the subject vehicles met U.S. safety and emissions standards. (Doc. 111 at 11.) Statement 4 is not a misrepresentation.

*Statement 5*. Plaintiffs assert that Statement 5 is a misrepresentation because "Ford dealerships honored U.S. warranties and performed warranty work" on the subject vehicles.[5] (Doc. 111 at 12.) The affidavit only mentions warranties to the extent it talks

---

[5] Plaintiffs do not point to any evidence in the record supporting this assertion; they merely state that "Mark Enterprises confirmed this after extensive due diligence." (Doc.

1    about the complaints made by Wilson and the Dunns. (Doc. 101-2 at 13, 25–26.) Ali makes

2    no statement in the affidavit that "Cooper's Fords sold by Mark Enterprises were not

3    covered by warranties," (Doc. 111 at 12); instead, the affidavit presents findings from Ali's

4    investigation into Wilson's complaint and includes lines pulled verbatim from the Dunns'

5    complaint. (*Id.*) And, in any event, there is evidence in the record that would support an

6    assertion that some Ford dealerships would not honor the subject vehicles' warranties. (*See,*

7    *e.g.*, Doc. 106-3 at 42.)

8         *Statement 6.* Plaintiffs argue that Statement 6 was a misrepresentation because Ali

9    cannot establish that Plaintiffs "knew about or participated in the replacement of" the

10   vehicles' certification/manufacturer labels. (*Id.*) But the affidavit does not state whether

11   Plaintiffs knew of or participated in the replacement of any labels, only that "it appeared

12   someone had removed the original manufacturer labels and replaced them [illegally]."

13   (Doc. 101-2 at 21.) The affidavit lists and summarizes the opinions of Mortensen,

14   Kosofsky, and Thurgood. (*Id.*) Their opinions indicate that the subject vehicles, which were

15   supposedly legally imported from Mexico, had English labels instead of Spanish labels

16   with additional certification labels affixed to them—indicating potential fraud. (*Id.*)

17   Statement 6 was not a misrepresentation.

18        *Statement 7.* Plaintiffs do not advance any argument in support of their allegation

19   that Statement 7 is a misrepresentation. On the other hand, Defendants support Statement

20   7 with information Wilson provided in an interview with Ali. (Doc. 101 at 13.) In that

21   interview, Wilson confirms he purchased a vehicle from Plaintiffs with the understanding

22   "it was the 'Platinum' trim model," but the Platinum trim model would have come

23   equipped with amenities not included in the vehicle he purchased from Mark Enterprises.

24   (Doc. 106-2 at 2–3.) And HSI's investigation revealed other Platinum trim features missing

25   from Wilson's vehicle. (*Id.*) Statement 7 is not a misrepresentation.

26        *Statement 8.* Plaintiffs argue that Statement 8 is a misrepresentation because they

27   resolved the complaints mentioned in the affidavit. But the affidavit does not represent that

28
_____

111 at 12.)

1    Mark Enterprises failed to resolve complaints. It merely states that complaints were made.[6]

2    (*See* Doc 101-2 at 13–28.) The affidavit only mentions warranties and the vehicles'

3    equipment to the extent that Wilson's and the Dunns' complaints mention them, as

4    addressed earlier. (*Id.* at 22–28, 35–37.)

5            Plaintiffs fail to show that the affidavit includes any misrepresentations.

6                          **ii.   Alleged Omission from the Affidavit**

7            Plaintiffs argue Defendants committed judicial deception by failing to include

8    information which "could have been acquired prior to the completion and submission" of

9    the affidavit. (Doc. 45 ¶ 42.) Specifically, Plaintiffs assert that Defendants omitted

10   information related to Ford's Online Automotive Service Information System ("OASIS")

11   software, "which provides a 'build sheet' describing the truck's manufacturing

12   information; warranty status; and components, including safety and emissions equipment"

13   and which was accessible easily with a vehicle's VIN number. (Doc. 111 at 6; *accord.* Doc.

14   45 ¶ 42.) Plaintiffs argue the inclusion of the OASIS information would have established

15   that the subject vehicles had a valid warranty and inclusion of information from the build

16   sheets would have established that Ford built them in Dearborn, Michigan. (Doc. 45.)

17           Defendants respond that the omission of the OASIS information and build sheets

18   was immaterial to the probable cause finding. The Court agrees. "The government need

19   not include all of the information in its possession to obtain a search warrant. . . . The

20   omission of facts rises to the level of misrepresentation only if the omitted facts 'cast doubt

21   on the existence of probable cause.'" *United States v. Johns*, 948 F.2d 599, 606–07 (9th

22   Cir. 1991) (quoting *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980)).

23           To establish a *material* omission, Plaintiffs must prove that the judge "would have

24   declined to issue the [warrant]" without the alleged omissions. *David*, 38 F.4th at 801.

25   Thus, the Court determines materiality by examining "whether the affidavit, once corrected

26   and supplemented [with the omitted information], establishes probable cause." *Ewing¸* 588

27   F.3d at 1224. Here, even if Ali had included facts related to OASIS and the build sheets, a

28
_____
        [6] Even if the complaints *were* resolved, this omission would not be material to the
probable cause finding. *See supra* Section III.a.ii.

1    magistrate still could have found probable cause to issue the warrant based on information

2    from Mortensen, Thurgood, and Kosofsky. The additional facts Plaintiffs offer do not

3    undermine the probable cause finding.

4          Plaintiffs fail to show a triable issue of fact that Defendants made any material

5    misrepresentations or omissions in the affidavit. Defendants are entitled to summary

6    judgment for Count I.

7          **b.  Count III—Unreasonable Search**

8          As Count III, the SAC alleges that Defendants engaged in an unreasonable search

9    in violation of the Fourth Amendment. (Doc. 45 at 33.) At oral argument, Plaintiffs

10   clarified that they do not allege Defendants acted outside the scope of the warrant issued.

11   Instead, Plaintiffs argue that, though the search fell within the scope of the warrant, the

12   warrant issued was nevertheless too broad. Defendants raise a qualified immunity defense.

13   Plaintiffs respond that Defendants are not entitled to qualified immunity because "it [was]

14   obvious that no reasonably competent officer would have concluded that a warrant should

15   issue." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). The Court disagrees.

16         Government officials enjoy qualified immunity from civil damages unless their

17   conduct violates "clearly established statutory or constitutional rights of which a reasonable

18   person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The

19   qualified-immunity doctrine "gives government officials breathing room to make

20   reasonable but mistaken judgments about open legal questions," and it protects "all but the

21   plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S.

22   731, 743 (2011) (internal quotation omitted).

23         The Supreme Court in *Messerschmidt* held that "[w]here the alleged Fourth

24   Amendment violation involves a search or seizure pursuant to a warrant, the fact that a

25   neutral magistrate has issued a warrant is the clearest indication that the officers acted in

26   an objectively reasonable manner or . . . in 'objective good faith.'" 565 U.S. at 546 (internal

27   quotation marks omitted). A narrow exception to the rule exists where "it is obvious that

28   no reasonably competent officer would have concluded that a warrant should issue." *Id.* at

1    547. The "threshold for establishing this exception is a high one." *Id.* If the exception is

2    met, the officers are not entitled to qualified immunity. *Id.*

3          Plaintiffs argue that Defendants lost the "shield of immunity" afforded by executing

4    the search within the scope of the warrant because the affidavit supporting the warrant was

5    "so lacking in the indicia of probable cause" and so overbroad "that no reasonably

6    competent officer would have" executed it. (Doc. 111 at 15–16.) First, Plaintiffs state that,

7    because the affidavit does not include a statement regarding Plaintiffs' personal knowledge

8    or involvement in the counterfeiting or relabeling of the vehicles, the warrant lacked a

9    "nexus" between the activities alleged and the items to be searched. (*Id.*)

10         But Ali did not need to show Plaintiffs' personal knowledge or involvement of the

11   labeling in his affidavit to have a sufficient nexus; he only needed to show that "the

12   evidence sought [at the dealership] will aid in a particular apprehension or conviction for

13   a particular offense." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (quoting *Warden v.*

14   *Hayden*, 387 U.S. 294, 307 (1967)). Ali did not state that any specific person relabeled the

15   vehicle, only that the practice of relabeling vehicles appeared to be inconsistent with

16   applicable U.S. law, indicating fraud under Arizona law. (Doc. 101-2 at 10–12.) Ali

17   indicated, in his affidavit, where and what items he had probable cause to believe could

18   assist in a future conviction. (*Id.* at 14–16.) Plaintiffs have not presented any evidence

19   indicating that Ali acted unreasonably by stating that the vehicles did not have correct

20   labeling under U.S. importation law or that he had probable cause to believe fraud had

21   occurred.

22         Plaintiffs further argue that "no reasonable magistrate could have concluded that

23   [Plaintiffs'] personal and business devices would hold evidence of illegal activity." (Doc.

24   111 at 15–16.) Plaintiffs state that the magistrate wrote the warrant too broadly to include

25   "electronic devices and data." (*Id.*) Plaintiffs' argument rests on the theory that, not only

26   did a neutral magistrate issue a warrant too broad in violation of the Fourth Amendment

27   but that Defendants, not formally trained in the law, should have realized this and refused

28   to execute the warrant. (Doc. 111 at 16.) This argument fails.

1    *Messerschmidt* sets an exceedingly high hurdle for Plaintiffs to jump to show that

2    an *officer* should have known no warrant should issue. In *Messerschmidt*, the defendants

3    executed a warrant, allowing them "to search for and seize all firearms" inside the

4    plaintiff's home. *Id.* at 548. The plaintiffs argued that no reasonable officer could have

5    concluded that probable cause existed to search for *all guns* in the home when the

6    underlying crime was committed using a single "black sawed off shotgun with a pistol

7    grip." *Id.* (quotation marks omitted). The plaintiffs asserted that any reasonable officer

8    should have known that the warrant issued was unconstitutionally broad and unsupported

9    by the affidavit. *Id.* The Court disagreed and held that, even assuming the warrant was

10   overbroad, the defendant acted reasonably when executing the warrant because a

11   reasonable officer could conclude that the plaintiffs owned additional illegal guns based on

12   the plaintiffs' membership in a gang and "willingness to use the gun to kill someone." *Id.*

13   Additionally, a reasonable officer could conclude that "seizure of the firearms was

14   necessary to prevent further [crimes]." *Id.*

15   Applying *Messerschmidt* here, Defendants are entitled to qualified immunity. Even

16   assuming the warrant issued was too broad, Defendants did not act unreasonably by

17   searching and seizing electronic data used by employees and located at the dealerships in

18   warrant. Like the defendant in *Messerschmidt*, Ali could reasonably conclude that

19   information related to violations of Arizona's fraud and conspiracy laws, such as

20   communications discussing the importation of vehicles or evidence mentioning the

21   counterfeit labeling of Lobos, could be found on digital devices listed in the search warrant.

22   Ali and officers executing the warrant could have also based the scope of the warrant on

23   their extensive experience in gathering evidence in previous investigations and reasonably

24   concluded that the scope was permissible. (*See* Doc. 101-2 at 16–17.)  Lastly, it was not

25   unreasonable for Defendants to conclude that they needed to collect a wide range of

26   electronic data and devices to support "a broad investigation of TCB Importing and Johnny

27   Cooper." (Doc. 101 at 4.) In any event, Defendants did not act "plainly incompetent[ly]"

28   in executing the warrant—which is the level of conduct required to overcome the shield of

1    qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

2        Defendants are entitled to qualified immunity for the search. The Court grants

3    Defendants summary judgment on Count III.

4        **c.  Count II—Supervisory Liability**

5        Count II of the SAC alleges that the Supervisory Defendants share liability for the

6    alleged Fourth Amendment violations in the issuance and execution of the warrant. (Doc.

7    45 at 32.) To establish supervisory liability in a § 1983 action, a plaintiff must first show

8    "the supervisor's subordinates violated the constitution." *Serna v. Colorado Dep't of*

9    *Corrections*, 455 F.3d 1146, 1151 (9th Cir. 2006). Second, the plaintiff must establish that

10   each individual defendant either "participated in or directed the violations or knew of the

11   violations of subordinates and failed to act to prevent them." *Puente v. City of Phoenix*,

12   123 F.4th 1035, 1064 (9th Cir. 2024) (quotation marks omitted). Because Plaintiffs'

13   supervisory liability claim relies on the underlying Fourth Amendment violations in the

14   other Counts and those Counts fail, the Supervisory Defendants are entitled to summary

15   judgment on Count II.

16   **IV.    Conclusion**

17       Plaintiffs fail to show any misrepresentation or omission to form the basis of Count

18   I, and Defendants are entitled to qualified immunity for Count III. Because neither of those

19   claims stand, Count II fails as well. Accordingly, the Court grants Defendants summary

20   judgment on all claims.

21       **IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 101) is

22   **GRANTED**. The Clerk is directed to deny any remaining motions as moot, enter judgment

23   accordingly, and terminate the case.

24       Dated this 21st day of April, 2025.

25

26

27   _____
     Douglas L. Rayes

28                Senior United States District Judge